**Entered on Docket**
**July 23, 2008**
**GLORIA L. FRANKLIN, CLERK**
**U.S BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



**The following constitutes**
**the order of the court. Signed July 23, 2008**

*Marilyn Morgan*

**Marilyn Morgan**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONICBLUE INCORPORATED, a Delaware Corporation, et al., <br><br> Debtors. | Case No. 03-51775-MM <br><br> Chapter 11 |
| DENNIS J. CONNOLLY, chapter 11 trustee, <br><br> Plaintiff, <br><br> vs. <br><br> PILLSBURY WINTHROP SHAW PITTMAN LLP, <br> Defendant. | Adversary No. 08-5084 <br><br> **MEMORANDUM DECISION ON PILLSBURY WINTHROP SHAW PITTMAN LLP'S MOTION TO DISMISS COMPLAINT, OR DISMISS AND/OR STRIKE PORTIONS OF COMPLAINT** |

## BACKGROUND

After an eleven month investigation, Dennis Connolly, trustee of the estates of SONICblue Incorporated and its three operating subsidiaries, filed an adversary proceeding that alleges breach of fiduciary duty, legal malpractice and failure to disclose conflicts of interest by SONICblue's bankruptcy counsel, Pillsbury Winthrop Shaw Pittman LLP. PWSP has moved, under Bankruptcy Rule 7012(b),

to dismiss each of the complaint's three counts for failure to state a claim upon which relief can be granted. Alternatively, PWSP asks that a portion of the prayer for relief be stricken as legally insufficient.

By way of background, in 1996, long before SONICblue filed for bankruptcy protection, PWSP assisted SONICblue with a private placement of $103.5 million in 5¾% convertible subordinated notes ("1996 Notes"). Beginning in 2000, however, SONICblue sustained significant operating losses. To offset the losses, SONICblue, with PWSP's knowledge, began to sell off stock that it owned in United Microelectronics Corporation. Then, in April 2002, PWSP helped SONICblue raise additional funds through a second private placement of $75 million in 7¾% senior secured subordinated convertible debentures ("2002 Notes"). Three institutional bondholders ("2002 Noteholders"), acquired the notes for $62.25 million. The infusion of capital did not work and, in October 2002, SONICblue consulted PWSP for restructuring advice. SONICblue and its three operating companies filed chapter 11 petitions on March 21, 2003.

The court must accept all well-pleaded allegations of the complaint as true and construe all reasonable inferences from those allegations in the Trustee's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S. Ct. 1843 (1969). With that principle in mind, the allegations and inferences from the 514 paragraphs detailed in the complaint are stated in a light favorable to the Trustee as summarized below.

## ALLEGATIONS OF THE COMPLAINT

**1.     Issuance of the 2002 Notes**.

Leading up to the issuance of the 2002 Notes, SONICblue consulted PWSP for legal advice regarding the financing. In the course of providing that service, PWSP did not advise SONICblue's

2

officers and directors that SONICblue should obtain a complete financial analysis, business plan and projection of its business operation before issuing the notes. Additionally, PWSP raised no alarm bell to alert the officers and directors that the 2002 Notes might be considered death spiral financing or that issuance of the notes might breach fiduciary duties owed to SONICblue's creditors because SONICblue was within or near the zone of insolvency.

**2.    The Investment Board and Pachulski Letters**.

Following the issuance of the 2002 Notes, certain SONICblue creditors challenged the timing and wisdom of SONICblue's decision to incur new debt. In June 2002, the State of Wisconsin Investment Board wrote both to SONICblue's general counsel, David Gerhson, and to PWSP, asserting that the circumstances surrounding the issuance of the 2002 Notes suggested that SONICblue's board of directors had failed to adequately investigate the transaction and had engaged in "apparent mismanagement, fraud or other impropriety." The Investment Board questioned whether SONICblue's directors exercised informed, disinterested business judgment and accused the company of engaging in death-spiral financing that was detrimental to the company's equity holders. In addition to PWSP's receipt of the letter, Gershon directly told PWSP that the Investment Board was contemplating a legal challenge to SONICblue's issuance of the 2002 Notes.

Although PWSP knew that it had not advised SONICblue about death spiral financing during the negotiation and issuance of the 2002 Notes, it summarily rejected the authorities cited in the Investment Board's letter and concluded that the 2002 Notes did not qualify as death spiral financing. Further, PWSP assumed, without investigating, that SONICblue would have dismissed any concerns it might have had even if the transaction did amount to death spiral financing. As a result, PWSP denied the Investment Board's allegations without consulting SONICblue's officers and directors.

Case: 08-05084    Doc# 15    Filed: 07/23/08    Entered: 07/23/08 16:05:57    Page 3 of 23

Similarly, in July 2002, Richard Pachulski, counsel for some of the investors who purchased the 1996 Notes, raised concerns about the 2002 Notes, SONICblue's solvency and whether SONICblue's board of directors had received adequate legal advice. His letter to SONICblue's Chairman, President and CEO stated:

> Our chief concern, therefore, is that the Company may be, or shortly become, insolvent. As I hope counsel may have advised you, when a corporation is within, or in the vicinity of, the zone of insolvency, the fiduciary duties owed by its directors and officers expand to include not only the interests of shareholders but also those of other stakeholders, such as bondholders . . . [case citations omitted].

Pachulski also contended that usurious terms and the secrecy with which the 2002 Notes were issued indicated that SONICblue's SEC filings and public announcements did not portray an accurate picture of the company's financial condition.

After PWSP reviewed both the Investment Board and the Pachulski letters, PWSP began to prepare a memorandum for SONICblue's directors and officers to advise them about their expanded fiduciary duties while SONICblue was in the zone of insolvency. On October 11, 2002, even though PWSP had not completed its zone of insolvency memorandum or otherwise advised SONICblue's directors and officers of any additional duties, PWSP responded to the Pachulski letter, misrepresenting that SONICblue's "directors and officers are well aware of their fiduciary duties within the 'zone of insolvency.'" Pachulski's follow-up letter, dated October 23, 2002, reiterated his clients' concern that SONICblue's directors and officers breached their fiduciary duties by failing to obtain a complete financial analysis, business plan and projection before issuing the 2002 Notes.

PWSP never alerted SONICblue that the Investment Board and Pachulski letters, at least implicitly, accused PWSP of legal malpractice. As a result, PWSP did not notify SONICblue that it should retain independent counsel to respond to the allegations in either the Investment Board letter or

4

the Pachulski letters. Further, PWSP failed to obtain SONICblue's informed consent to continue as PWSP's counsel despite the potential conflicts described in the letters.

**3.      Sales of UMC Stock.**

Between the issuance of the 2002 Notes and SONICblue's decision to seek bankruptcy protection, the company continued to sell off shares of UMC stock to cover operating losses. PWSP knew that the UMC stock was one of SONICblue's most valuable assets. Nevertheless, PWSP failed to advise SONICblue's officers and directors that the stock sales might violate the officers' and directors' fiduciary duties while in the zone of insolvency or to provide SONICblue with the legal memorandum that PWSP had begun to prepare on zone of insolvency issues.

The 2002 Noteholders demanded that SONICblue cease all sales of UMC stock because the company's officers and directors had failed to properly analyze UMC's business prospects before selling the stock. The 2002 Noteholders contended that SONICblue, as well as its officers and directors, had breached fiduciary duties owed to SONICblue's creditors while within the zone of insolvency.

**4.      Preferential Transfers.**

On October 25, 2002, PWSP and SONICblue entered into a new retention agreement in contemplation of SONICblue's bankruptcy filing. As part of the agreement, PWSP insisted on a replenishing retainer provision that was designed to avoid preferential transfers by eliminating payments on account of antecedent debt. Specifically, the agreement required SONICblue to prepay PWSP's fees by posting an initial $500,000 retainer and then replenishing the retainer so it never fell below $300,000. During the five month period between the date of the retention agreement and SONICblue's bankruptcy filing, PWSP received $2,118,837.41 from SONICblue.

5

In its initial Rule 2014 disclosure accompanying the firm's 2003 employment application, PWSP acknowledged that it had received payments from SONICblue during the 90-day period preceding the petition date. At the time of that disclosure, PWSP either knew or should have known that at least a portion of the payments received prior to the petition date was attributable to antecedent debt. Nevertheless, PWSP attorney, Craig Barbarosh, misrepresented, under penalty of perjury, that none of the payments was on account of antecedent debt.

In Fall 2005, SONICblue's creditors began to question the accuracy of PWSP's assertion that it did not receive any preference period payments from SONICblue that were on account of antecedent debt. Sensing trouble, PWSP conducted an internal analysis comparing its preference period receipts, the size of its retainer and the outstanding amount due for work it had performed. The analysis revealed that, contrary to the intent of the retainer, there were several occasions where the retainer only exceeded outstanding bills, not the full amount owed based on unpaid bills plus unbilled services rendered. In light of the analysis, PWSP knew that the retainer provision in the October 25, 2002 retention agreement had failed to perform as expected, that the firm might have preference exposure as great as $1,432,851.20, and that its initial and supplemental 2014 declarations had incorrectly represented that the firm had received no payments on account of antecedent debt.

Following the internal analysis, PWSP further commissioned one of its attorneys to prepare a detailed legal memorandum in an effort to establish either that any payments received were not on account of antecedent debt or that the firm had a valid defense to preference liability. Despite PWSP's hopes, the memorandum concluded that PWSP received at least some payments on account of antecedent debt, that PWSP lacked any complete defense and that, if PWSP had received a preference, it held an interest adverse to the estate from the inception of its employment as estate counsel.

6

In the face of PWSP's long-standing awareness of potential preference problems and its confirmation of the same in early 2005, PWSP still failed to disclose its receipt of preferential payments to the court or to SONICblue's creditors. To the contrary, in February 2006 and thereafter, PWSP willfully and consciously misled committee counsel by continuing to assert that PWSP received no preference period payments on account of antecedent debt. Specifically, PWSP prepared and sent an email to committee counsel attempting to explain why the receipts should not be characterized as antecedent debt even though PWSP knew that the position it was taking was not legally supportable. PWSP's failure to disclose its receipt of preferential payments to its client, its creditors or to the court consciously and willfully placed the firm's economic interest above those of the estates.

**5. Insurance Policy Renewals.**

In late 2002, SONICblue sought directors and officers insurance ("D&O insurance") from Admiral Insurance Company and Old Republic Insurance Company (collectively the "Insurance Carriers") to renew a Lloyds of London policy set to expire in December of that year. As part of the process, the Insurance Carriers required applications describing all written claims or demands that SONICblue or any of its officers and directors had received during the five previous years. Although PWSP assisted SONICblue with preparation of the renewal applications, PWSP failed to disclose or advise SONICblue to disclose the Investment Board and Pachulski letters or the 2002 Noteholders' demand to cease selling UMC stock that SONICblue had received earlier that year. Based on the information provided, the Insurance Carriers issued a one year renewal of the insurance policies.

Early in 2003, Gibson, Dunn & Crutcher LLP, on behalf of some of SONICblue's directors and officers, demanded copies of the Investment Board and Pachulski letters from PWSP. After receiving and reviewing the correspondence, Gibson Dunn notified PWSP that PWSP had failed to directly notify

7

the Insurance Carriers of claims in the letters and had failed to advise SONICblue to notify the Insurance Carriers. Similarly, in December 2003, certain 1996 Noteholders advised PWSP that PWSP had failed fulfill its obligation to independently disclose or have SONICblue disclose the Pachulski letters and the 2002 Noteholders' demands in the renewal applications. They further asserted that the failure to disclose the claims and demands violated the claims reporting requirements in the original Lloyds' policy.

After PWSP failed to correct the nondisclosures, Gibson Dunn notified the Insurance Carriers of the claims on December 15, 2003. Shortly thereafter, the Insurance Carriers sent word to SONICblue's officers and directors that Insurance Carriers would discontinue all D&O insurance coverage until the Insurance Carriers completed a review of SONICblue's failure to report the claims on the renewal applications.

About a year later, on March 18, 2005, PWSP filed an adversary complaint against the Insurance Carriers to recover insurance premiums that SONICblue paid to the Insurance Carriers during the preference period preceding SONICblue's bankruptcy. Then, on April 21, 2005, some of the 1996 Noteholders initiated a state court breach of fiduciary duty action against SONICblue's officers and directors relating to SONICblue's issuance of the 2002 Notes. In light of these new lawsuits, the Insurance Carriers issued a notice of intent to rescind SONICblue's D&O policies and to deny coverage for the 1996 Noteholders' complaint. As ground for the Insurance Carriers' decision, the notice asserted that PWSP and SONICblue engaged in material misrepresentations by failing to disclose in the renewal applications both the claims made in the Pachulski letter and the 2002 Noteholder demand that the UMC stock sales were improper.

PWSP recognized that the insurance carriers' decision to rescind the insurance coverage could have severe ramifications for PWSP and alerted the firm's general counsel of a potential claim against

8

the firm. Further influenced by the Insurance Carriers' notice of intent to rescind, PWSP also recommended that SONICblue dismiss its preference litigation against the Insurance Carriers; it was dismissed on November 11, 2005. Yet, PWSP never revealed to SONICblue that it had a conflict or potential conflict of interest related to the legal advice it gave on the renewal applications or that SONICblue should seek independent counsel to prosecute the preference action against the Insurance Carriers. PWSP also failed to solicit SONICblue's informed consent to continue to represent the company despite PWSP's conflict.

**6. Tolling Agreement.**

After dismissal of SONICblue's preference action against the Insurance Carriers, the Insurance Carriers, through their own adversary proceeding, requested declaratory relief to establish that they had no obligation to provide coverage related to the 1996 Noteholder action against SONICblue's officers and directors. That prompted the officers and directors, in June 2006, to demand indemnity from SONICblue both with respect to the 1996 Noteholder litigation and the Insurance Carriers' new request for a declaratory judgment. At the same time, counsel for the officers and directors contacted PWSP's claims attorney, John Grenfell, to request an agreement to toll the statute of limitations on any malpractice or other claims that the officers and directors might have against PWSP. PWSP executed the tolling agreement on August 18, 2006.

Recognizing its potential liability to SONICblue's officers and directors regarding both the insurance renewal applications and the issuance of the 2002 Notes, PWSP transferred responsibility for resolving the officers' and directors' indemnity demands to committee counsel. Nevertheless, PWSP failed to inform SONICblue of the conflict and failed to obtain written consent from its client to continue

9

its representation. It did not even notify SONICblue that it had transferred the directors' and officers' indemnity claims to committee counsel.

Subsequently, Grenfell prepared a summary of matters related to SONICblue that presented potential claims against Pillsbury, including, among other matters, the tolling agreement. PWSP consciously decided to keep the summary away from William Freeman, the PWSP attorney who signed the Eighth Supplemental Rule 2014 declaration. Not surprisingly, the Eighth Supplemental declaration, as executed, did not disclose the existence of the tolling agreement.

**7.      Decision to Allow D&O Insurance to Lapse.**

Unlike the original D&O insurance policies issued by Lloyds, the renewal policies provided for a new exception to the "insured v. insured" exclusion from coverage. It provided that claims brought by a trustee, an examiner or similar entity (such as an official committee of unsecured creditors) would not fall within the "insured v. insured" exclusions from coverage (the "Bankruptcy Exception"). Shortly after SONICblue filed for bankruptcy, committee counsel reviewed the renewal policies and, incorrectly, concluded that claims brought by a trustee, examiner or similar entity would not fall within the scope of insurance coverage. Although PWSP was aware of the Bankruptcy Exception, it failed to advise the committee or SONICblue. As a result, neither SONICblue nor the committee ever investigated whether there were any claims to be asserted on behalf of SONICblue. Instead, the committee filed a notice with the bankruptcy court that SONICblue would not extend its D&O insurance beyond its December 16, 2003 lapse date and that SONICblue would not pursue any claim against the company's officers and directors.

10

**8.      PWSP Opinion Letter.**

In conjunction with the issuance of the 2002 Notes, PWSP issued an opinion letter to the 2002 Noteholders regarding the enforceability of the 2002 Notes.  This opinion letter reads in pertinent part:

> 2.      . . . Each of . . . the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement and the Option Agreement, when duly executed and delivered by the Buyers, will each constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

> *  *  *

> 3.      The issuance and sale of the Debentures have been duly authorized.  Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

> *  *  *

> 9.      . . . (b)    Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally. . . .

In what may have been a scrivener's error, the caveats set forth in paragraph 9(b) only referred back to paragraph 2, and not to paragraph 3.

Soon after SONICblue's petition was filed, PWSP realized that the 2002 Noteholders' claim was one of the most significant claims in the case and would need to be liquidated.  PWSP recognized that the 2002 Noteholders had purchased their debenture package for a significant discount from the face value of the notes and concluded that, under the Bankruptcy Code, the unamortized portion of that "original issue discount" would be disallowed.  Despite that recognition, PWSP took no immediate action.  Two years later, in May 2005, PWSP reconsidered liquidating the 2002 Noteholders' claim but

11

decided not to proceed due to "political sensitivity." It also recognized that it could not ask committee counsel to pursue an objection because the 2002 Noteholders were members of the committee.

Finally, in July 2006, PWSP advised the 2002 Noteholders that SONICblue intended to object to their claim. Counsel for the 2002 Noteholders responded to PWSP stating that PWSP's 2002 opinion letter constituted an agreement to indemnify the 2002 Noteholders if they were precluded from recovering the full value of the 2002 Notes. He followed up with a written demand for indemnification that further threatened PWSP with claims for negligence and misrepresentation related to the opinion letter.

Despite PWSP's belief that committee counsel should not handle a claims objection directed against a committee member, PWSP transferred resolution of the 2002 Noteholders' claims to committee counsel. Nevertheless, the 2002 Noteholders' threats remained an impediment to PWSP's representation of SONICblue. PWSP waited six months to disclose this conflict to SONICblue, SONICblue's creditors or the court. Further, PWSP never sought or obtained SONICblue's informed consent to continue representation despite the conflict.

**9.     VIA Settlement.**

In 2000, SONICblue transferred its graphics chip business to a joint venture that it formed with VIA Technologies, Inc. SONICblue gave the joint venture all rights under a 1998 patent cross-license agreement between SONICblue and Intel Corporation. Shortly after SONICblue filed its bankruptcy petition, Intel filed a motion for relief from stay to terminate the patent cross-license agreement. Because the cross-license was essential to the joint venture, VIA and the joint venture each filed a $70 million claim against SONICblue based on any loss of the joint venture's rights under the cross-license. SONICblue objected to the claims and sought affirmative relief against VIA and the joint venture.

12

On September 15, 2005, the attorneys for SONICblue, VIA, and the joint venture agreed in principle to a settlement that would provide VIA and the joint venture with one $12.5 million allowed claim. Even though PWSP owed fiduciary duties to the SONICblue and none to the 2002 Noteholders, PWSP took the initiative to inform the 2002 Noteholders that the VIA allowed claim might rank senior in right of payment to the 2002 Noteholders' claims. After learning of that possibility, the 2002 Noteholders insisted that they would only consent to the settlement if a term was added to expressly provide that the VIA allowed claim would not rank senior in payment priority to the 2002 Noteholders' claims.

Both PWSP and special counsel for SONICblue acceded to the 2002 Noteholders' demand. However, the 2002 Noteholders did not offer and PWSP, despite its fiduciary obligations, did not request any consideration from the 2002 Noteholders in return. Then, in May 2006, PWSP reconsidered the language used to waive VIA's seniority rights and concluded that, as originally drafted, it might not adequately protect the 2002 Noteholders. PWSP, on its own, proposed modified language to better protect the 2002 Noteholders. Again, PWSP failed to request any consideration for the estate in return. Although VIA could have obtained the same economic recovery from a smaller claim entitled to priority versus a larger claim without priority, PWSP failed to advise SONICblue concerning the ramifications of choosing one option over the other.

In October 2006, about one month after the 2002 Noteholders's indemnity demands related to PWSP's opinion letter, PWSP filed a motion to approve the VIA settlement. Although PWSP knew that the waiver of VIA's priority benefitted the 2002 Noteholders, PWSP did not disclose the waiver as part of the motion to approve the settlement. It also did not disclose that the 2002 Noteholders refused to consent to the settlement unless the waiver of VIA's priority was incorporated.

13

**10.      Failure to File Tax Returns.**

In August 2003, SONICblue sought advice from PWSP about filing its 2002 tax returns.  Despite the request for advice, PWSP failed to inform SONICblue that it needed to file timely returns.  After the committee recognized that SONICblue had not filed timely returns, the committee asked its own accounting and litigation consultants to bid on preparing the company's 2002 and 2003 tax returns.  SONICblue turned down the committee's consultant and retained its own tax preparation firm.  SONICblue still failed to file the returns.  Because PWSP failed to adequately advise SONICblue about its tax filing obligations, SONICblue was precluded from selling its "tax attributes" to a third party for $100,000.

**11.      Substantive Consolidation.**

In late 2006, PWSP drafted a proposed plan of reorganization that SONICblue filed jointly with the committee.  The plan provided for substantive consolidation of the four debtor estates but no consolidation of SONICblue's other non-debtor subsidiaries.  PWSP did not seek substantive consolidation of the non-debtor entities because it would negatively affect contingency fees that PWSP might receive from pursuing preference actions on SONICblue's behalf.

**12.      Failure to Maintain Security Interests and Preserve Inter-Company Claims.**

Prior to bankruptcy, SONICblue's three operating companies, Diamond Multimedia Systems, Inc., ReplayTV, Inc. and Sensory Science Corporation maintained operations by using SONICblue employees and other assets.  At times, SONICblue paid the expenses of the operating companies without reimbursement.  Although PWSP was aware of these inter-company debts, it failed to advise SONICblue to file proofs of claims against the estates of the operating companies.

14

Further, in championing a plan that provided for substantive consolidation of SONICblue and its three operating companies, PWSP relied on SONICblue's security interests against the assets of the operating companies. However, PWSP failed to advise SONICblue to file continuation statements to preserve those security interests.

## DISCUSSION

### I. The First Claim for Relief Adequately States a Claim Arising Out of PWSP's Failure to Satisfy its Rule 2014 Disclosure Obligations.

The Trustee's first claim for relief alleges that PWSP willfully and consciously concealed a wide variety of connections and conflicts that should have been disclosed pursuant to Bankruptcy Rule 2014. PWSP asserts that this claim for relief must be dismissed because there is no private right of action for damages resulting from the failure to make required Rule 2014 disclosures. Although the complaint is couched in terms of "damages," the Trustee states that his first claim for relief seeks sanctions for bad faith conduct based on PWSP's deliberate effort to advance its own economic interest in representing SONICblue by willfully concealing the firm's conflicts of interest.

PWSP misapprehends the function of pleadings in federal practice. As the Ninth Circuit has recognized, notice pleading only requires a plaintiff to allege *claims for relief*, not causes of action, statutes or legal theories. *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008). It makes no difference that the first claim for relief does not specifically refer to sanctions or identify Bankruptcy Code §§ 105 and 327 as the basis for recovery. *Id.* at 1157-58 (plaintiff stated claim for statutory violation even though he never cited to the statute). Notice pleading anticipates that subsequent proceedings will refine the disputed facts and issues, including the legal theories. *Id.*

15

The real question is not whether the Trustee has a private right of action for damages, but rather whether the Trustee can properly recover sanctions in the context of this adversary proceeding. While sanctions are more typically requested by way of motion, courts have entertained such requests within adversary proceedings, even where, as here, there may be no private right of action for damages. *See, e.g., Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178 (9th Cir. 2003)(contempt sanctions awarded for willful violation of the automatic stay even though chapter 7 trustee had no private right of action for damages under Bankruptcy Code § 362(h)); *Gray v. Assali (In re McGrath)*, 2008 WL 859152 (E.D. Cal. Mar. 31, 2008); *Mini v. State of Calif., Bd. of Equalization (In re Mini)*, 2007 WL 2223820 (N. C. Cal. Jul. 30, 2007).

A court's power to issue sanctions arises from a variety of authority, including Rule 9011, the court's contempt powers and its inherent powers. *Dyer*, 322 F.3d at 1189-90 ; *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine)*, 77 F.3d 278, 284-85 (9th Cir. 1996); *In re Count Liberty, LLC*, 370 B.R. 259, 271 (C.D. Cal. 2007). Here, the Trustee's claim for relief is premised on the bankruptcy court's inherent powers, which permit an award of sanctions where a party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S. Ct. 2123 (1991). It allows the court "to deter and provide compensation for a broad range of improper litigation tactics." *Dyer*, 322 F.3d at 1196. *See also Rainbow*, 77 F.3d at 284.

To successfully obtain sanctions under the court's inherent authority, the Trustee will have to establish that PWSP engaged in willful misconduct or other bad faith acts that rise above mere negligence or recklessness. However, the Trustee's complaint sets forth a laundry list of willful nondisclosures, which if proven, may be sanctionable. PWSP's assertion that § 328(c) of the Bankruptcy Code provides the sole remedy for failure to satisfy the disclosure requirements of Rule 2014 is without merit. The

16

court's inherent power to sanction bad faith conduct arises from a separate and distinct source of authority and is not displaced or limited by other remedies that may be available in other federal statutes or rules. *Chambers,* 501 U.S. at 50-51, 111 S. Ct. 2123; *Daggett v. Cardinale (In re DeVille)*, 280 B.R. 483, 495 (9th Cir. B.A.P. 2002). Of course, the showing required for an award of sanctions is entirely different than the simple nondisclosures needed to disallow fees under § 328(c). I am also not swayed by PWSP's fear that sanctions opens the door to an award that has no relation to any damage that the estate may have suffered. Awards under the court's inherent sanction authority are limited to that which is appropriate and necessary to enforce the Bankruptcy Code. As the Ninth Circuit has recognized, in applying a court's inherent power to sanction, only compensatory, not punitive, damage awards are appropriate. *Dyer*, 322 F.3d at 1197.

## II. Plaintiff's Second and Third Claims for Relief Adequately Allege Damages Proximately Caused by the Alleged Breaches of Fiduciary Duty and Legal Malpractice.

To avoid dismissal, a complaint need only contain "enough facts to state a claim to relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, ___ U.S.___, 127 S. Ct. 1955, 1974 (2007). In other words, the factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965. Something more than "labels, conclusions or a formulaic recitation of the elements of a cause of action" is required. *Id.* This standard is a relatively recent shift away from the Court's long familiar rule that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 4147, 78 S. Ct. 99 (1957). There is little doubt that the second and third claims for relief, which respectively allege breach of fiduciary duty and legal malpractice, would survive a motion to dismiss under the *Conley*

17

formulation. *See, e.g., The Plan Committee v. Price Waterhouse Coopers, LLP*, 335 B.R, 234 (D.D.C. 2005)(pre-*Twombly* complaint adequately alleged causation and damages for legal malpractice). However, an issue remains as to whether the allegations of causation and damage are adequate in light of the retirement of the *Conley* standard.

As the Second and the Seventh Circuit have already recognized, the courts must be careful not to overread the *Twombly* decision. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1982-83 (7th Cir. 2008); *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). These circuits have drawn on the conflicting signals within the Supreme Court's opinion to conclude that *Twombly* does not universally amplify the pleading requirements set out in Fed. R. Civ. P. 8(a). Rather, the "plausibility" standard enunciated by the court is flexible. At most, it requires additional factual allegations in certain contexts, but only as necessary to show that the plaintiff's right to relief is plausible. *Tamayo*, 526 F.3d at 1083, *Iqbal*, 490 F.3d at 157-58.

I find the reasoning of *Tamayo* and *Iqbal* to be persuasive. Despite the Supreme Court's adoption of the "plausibility" standard, *Twombly* did not entirely overrule *Conley*. To the contrary, at points, the decision in *Twombly* cited *Conley* with favor, reiterating that a complaint's purpose is properly limited to providing the defendant with fair notice of what the claim is and the grounds upon which it rests. *Id.* at ___, 127 S. Ct. at 1964, *quoting*, *Conley v. Gibson*, 355 U.S. at 47. While a plaintiff may not rely on "mere labels, conclusions or a formulaic recitation of the elements of a cause of action," *Twombly*, 127 S. Ct. at 1965, ultimately all that Fed. R. Civ. P. 8 (a)(2) requires is a short and plain statement showing that the plaintiff is entitled to relief. Detailed factual allegations remain unnecessary. *Twombly*, 127 S. Ct. at 1964. Two examples are illustrative. The Court in *Twombly* explicitly noted the sufficiency of Form 9 of the Federal Civil Rules, Complaint for Negligence. That standard form complaint alleges that

18

a defendant "negligently drove a motor vehicle against plaintiff who was then crossing [an identified] highway" without any supporting facts describing how the defendant was negligent. *Id.* at 1970, n.10. Also, just two weeks after the decision in *Twombly*, the Supreme Court ruled that a pro se prisoner did not need to allege specific facts to support his claim of cruel and unusual punishment. It was enough that the prisoner had alleged that he had Hepatitis C, that prison officials withheld treatment and that his life was in danger as a result. *See Erickson v. Pardus*, __ U.S. __, 127 S. Ct. 2197 (2007).

The conclusion that additional factual allegations are only required where necessary to establish the plausibility of the plaintiff's claims is also in accord with the Ninth Circuit's treatment of *Twombly*. Although the Ninth Circuit has not yet engaged in an in-depth analysis of *Twombly*, its post-*Twombly* decisions have consistently reiterated that under Fed. R. Civ. P. 8 the federal courts continue to apply a notice-pleading standard, that a complaint need only contain sufficient facts to support a cognizable legal theory, and that pleadings must be construed liberally to achieve "substantial justice." *See, e.g., Mendiondo v. Centinela Hospital Medical Center*, 521 F.3d 1097, 1103-04 (9th Cir. 2008); *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008); *Skaff v. Meridien North America Beverly Hills, LLC*, 506 F.3d 832, 839-42 (9th Cir. 2007). The only circumstance under which the Ninth Circuit has required heightened pleading, like *Twombly*, is the antitrust context, like *Twombly*. *See e.g., Rick-Mik Enterprises, Inc. v. Equilon Enterprises, LLC*, __F.3d__, 2008 WL 2697793, at *5 (9th Cir. July 11, 2008)(for purposes of pleading in antitrust cases, the Supreme Court abrogated the usual notice pleading rules); *Kendall v. Visa U.S.A., Inc.*, 518 F. 3d 1042, 1047 n.5 (9th Cir. 2008)(same).

Under the principles explained above, the second and third claims for relief survive PWSP's motion to dismiss. Far from relying on "mere labels, conclusions or a formulaic recitation of the elements" of his causes of action," the Trustee has alleged detailed facts showing that PWSP may have

19

committed errors both in judgment and action that breached its fiduciary duties. Additionally, the path PWSP chose to follow, if proven, may have fallen below the standard of ordinary care. Although the Trustee's ultimate allegations of causation and damage are succinctly stated in a conclusory fashion, the myriad of facts alleged in his complaint demonstrate a plausible basis for inferring that PWSP's wrongful conduct harmed SONICblue. A complaint need only contain direct or inferential allegations regarding all material elements of a claim. *Twombly*, 127 S. Ct. at 1965. *See also Iqbal*, 490 F.3d at 170 (conclusory allegation of knowledge for supervisory liability was adequate where, under the facts, it was at least plausible that a warden would know of mistreatment inflicted by those under his command). Here, specific allegations of the type and amount of harm is unnecessary.

Even after *Twombly*, the issue at the pleading stage is not whether the Trustee will ultimately prevail, but whether he has given sufficient notice of his claims to be entitled to proceed beyond the pleading stage. *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978), *cert. denied*, 441 U.S. 965 (1979). As long as notice of a claim and the grounds upon which it rests is given in satisfaction of Fed. R. Civ. P. 8, concerns about specificity in pleading are better addressed through the array of discovery devices available to PWSP. *Meridien*, 506 F.2d at 842. Whether the Trustee can prove causation and damages may be better suited for summary judgment.

**III.    The Trustee's Request to Recover his Attorneys' Fees Incurred in Prosecuting this Adversary Proceeding Is Limited, But Not Stricken.**

PWSP urges that even if the complaint is not dismissed outright, the Trustee's request to recover "attorneys' fees incurred in bringing this action" should be denied as improper under the American Rule. PWSP does not object, at this time, to the recovery of fees incurred in the course of the Trustee's investigation of the bankruptcy cases and the estates' claims. The Trustee contends that he is entitled

20

to recover his fees associated with this adversary proceedings as a natural and foreseeable consequence of the alleged breaches of fiduciary duty and legal malpractice.

Under the American Rule, litigants bear their own attorneys' fees. A prevailing litigant is ordinarily not entitled to attorneys' fees from the non-prevailing party. *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, __ U.S. ___, 127 S. Ct. 1199, 1203 (2007); *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S. Ct. 1612, 1616 (1975). Nevertheless, this rule can be overcome by statute or an enforceable contract provision allocating attorneys' fees. *Travelers*, 127 S. Ct. at 1203. The Trustee's attempt to circumvent the American Rule because the fees associated with this litigation are foreseeable damages attributable to PWSP's tortious conduct is not persuasive. That argument could be made in virtually any litigation context and, if fees were allowable on that basis, it would eviscerate the American Rule. Moreover, the fees requested are not those associated with additional third-party litigation that only became necessary due to PWSP's alleged tortious conduct. As a result, the fees do not constitute an item of damage based on the "third party exception" to the American Rule and will not be allowable item of damage with respect to the second and third claims for relief.

In the context of civil sanctions, however, attorneys' fees and other costs of pursuing the sanctions award are an appropriate item of compensatory damages or sanctions. *Dyer*, 322 F.3d at 1193. The Trustee's complaint uses an all-inclusive prayer for relief that sets forth various items of recovery without connecting each item to a specific claim for relief. Because attorneys' fees might be appropriate with respect to the first claim for relief, the prayer will not be stricken from the complaint.

Case: 08-05084   Doc# 15   Filed: 07/23/08   Entered: 07/23/08 16:05:57   Page 21 of 23

## <u>CONCLUSION</u>

Based on the foregoing, the court concludes that PWSP's Motion to Dismiss Complaint, or Dismiss and/or Strike Portions of the Complaint is denied.  PWSP is directed to file its Answer to the complaint on or before August 4, 2008.

Good cause appearing, IT IS SO ORDERED.

**** END OF ORDER ****

22

Adv. P. 08-5084

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## <u>SERVICE LIST</u>

| | |
|---|---|
| James L. Lopes | Grant T. Stein |
| Steven E. Schon | ALSTON & BIRD LLP |
| Bernard A. Burk | 1201 West Peachtree Street |
| Gary M. Kaplan | Atlanta, Georgia 30309 |
| HOWARD RICE NEMEROVSKI CANADY FALK & RUBIN | |
| Three Embarcadero Center, 7th Floor | |
| San Francisco, CA 94111-4024 | |

Cecily A. Dumas
FRIEDMAN DUMAS & SPRINGWATER LLP
150 Spear Street, Suite 1600
San Francisco, CA 94105

23